UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLYDE MICKENS, | ) | Case No.  1:07CV2706 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, | ) | MEMORANDUM ORDER AND OPINION |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

Clyde Mickens ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB").  ECF Dkt. #1.  Plaintiff asserts that: (1) the Administrative Law Judge ("ALJ") erred in applying the principle of *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), in denying his application for DIB; (2) the ALJ erred in finding that Plaintiff's pain was not disabling; and (3) the ALJ's assessment of Plaintiff's mental residual functional capacity ("MRFC") was legally sufficient and unsupported by the evidence of record.  For the following reasons, the Court AFFIRMS the ALJ's decision as to Plaintiff's physical impairments and pain, but REVERSES AND REMANDS the ALJ's decision relating to the application of *Drummond* to Plaintiff's MRFC, Plantiff's MRFC, and credibility determinations relating to Plaintiff's mental impairments and their disabling impact.

1

## I.     PROCEDURAL AND FACTUAL HISTORY

On July 27, 2001, ALJ Robert Isbell denied Plaintiff's May 13, 1999 application for DIB alleging disability beginning December 31, 1997 due to vertebrogenic and mental impairments.  Tr. at 38.  The ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the cervical spine, status post cervical disc herniation, degenerative disc disease of the lumbar spine, depression, and psychological factors affecting physical condition.  *Id.* at 43.  However, the ALJ found that none of these impairments, individually or in combination, met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ further found that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of light work, but he could not work at unprotected heights, or climb ladders, ropes or scaffolds at all, and he could climb ramps and stairs on no more than an occasional basis.  *Id.*  The ALJ further found that Plaintiff could not stoop, kneel, crouch or crawl on more than an occasional basis and he was restricted to work involving low production quotas and limited interpersonal contact.  *Id.*  ALJ Isbell also found that Plaintiff was able to perform his past relevant work as a mail clerk and therefore was not under a disability and not entitled to DIB.  *Id.* at 44.

In September 2001, Plaintiff filed a second application for DIB, again alleging disability beginning December 31, 1997.  Tr. at 47.  The SSA denied Plaintiff's application initially and on reconsideration.  *Id.*  Plaintiff requested a hearing before an ALJ, but then withdrew this request in a letter dated February 18, 2004.  *Id.*  The ALJ dismissed Plaintiff's request for hearing and found that the reconsideration denial dated April 23, 2002 remained in effect.  *Id.*

On May 12, 2004, Plaintiff filed the instant application for DIB alleging disability beginning December 31, 1997 due to depression, low back pain with radiculopathy, lumbar disc displacement,

right ankle pain following fracture, and cervical disc displacement.  Tr. at 77.  The SSA denied

Plaintiff's application initially and on reconsideration.  *Id*. at 48-57.  Plaintiff filed a request for

hearing before an ALJ, and the ALJ held a hearing on October 2, 2006, with Plaintiff and a vocational

expert testifying.  *Id.* at 58, 476.

## II.    <u>SUMMARY OF RELEVANT PORTIONS OF ALJ'S DECISION</u>

On November 17, 2006, ALJ Carissimi issued a decision denying Plaintiff's application for

DIB.  Tr. at 14-23.  He noted that Plaintiff had amended his onset date of disability to April 24, 2002

in light of the April 23, 2002 reconsideration decision that Plaintiff did not pursue.  *Id.* at 14.  Plaintiff

had also requested a reopening of the prior determination with consideration of an onset date of July

27, 2001, but the ALJ found that Plaintiff did not present circumstances which warranted reopening

and revising the April 23, 2002 reconsideration decision.  *Id.*  He therefore confined his decision to

April 24, 2002 through December 31, 2003, the date of the reconsideration denial through the date

that Plaintiff last acquired sufficient quarters of coverage to remain insured.  *Id*. at 15.

In denying Plaintiff's application for DIB, ALJ Carissimi relied upon the decision of

*Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), in which the Sixth Circuit held that *res*

*judicata* applied to administrative proceedings and found that "[a]bsent evidence of an improvement

in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  *Id*. at 19,

citing *Drummond*, 126 F.3d 837.  The SSA acquiesced to the Court's ruling in *Drummond* and stated

in Social Security Acquiescence Ruling 98-4(6) ("SSAR98-4(6)") that:

> When adjudicating a subsequent disability claim with an unadjudicated period arising
> under the same title of the Act as the prior claim, adjudicators must adopt such a
> finding from the final decision by an ALJ or the Appeals Council on the prior claim
> in determining whether the claimant is disabled with respect to the unadjudicated
> period unless there is new and material evidence relating to such a finding or there has
> been a change in the law, regulations or rulings affecting the finding or the method for
> arriving at the finding.

Upon review of the evidence, ALJ Carissimi stated that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and depression, but these impairments did not meet or equal any impairment in the Listings.  Based upon his review of the new evidence, the principles of *Drummond,* and AR 98-4(6), ALJ Carissimi found that he was bound by the findings of ALJ Isbell because no new and material evidence or other circumstances existed which would warrant a deviation from the RFC set by ALJ Isbell.  *Id*. at 19. Thus, ALJ Carissimi found that Plaintiff retained the RFC to lift/carry and push/pull up to twenty pounds occasionally and ten pounds frequently, and he could stand and/or walk six hours of an eight-hour workday.  Tr. at 18.  ALJ Carissimi further found that Plaintiff could not work at unprotected heights, or climb ramps and stairs more than occasionally, and he could never climb ladders, ropes or scaffolds.  *Id*.  He also found that Plaintiff could only occasionally stoop, kneel, crouch and crawl, and he was limited to work involving low production quotas, no piece work, and only superficial interaction with co-workers, supervisors and the public.  *Id*.  He further opined that Plaintiff was unable to perform his past relevant work as a truck driver, but he could perform a significant number of unskilled jobs in the national economy with his RFC.  *Id*. at 22.  ALJ Carissimi therefore determined that Plaintiff was not under a disability and not entitled to DIB.  *Id.*

Plaintiff requested that the Appeals Council review the ALJ's decision and the Appeals Council denied this request, finding no basis for changing the ALJ's decision.  Tr. at 4-6.

Plaintiff filed a timely appeal to this Court on September 6, 2007, and Defendant answered. ECF Dkt. #s 1, 9.  Both parties have filed briefs addressing the merits of the case.  ECF Dkt. #s 13, 15.  At issue is the decision of the ALJ dated November 17, 2006, which stands as the final decision. Tr. at 14-23; 20 C.F.R. § 404.984.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's

scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**V.**     **LAW AND ANALYSIS**

    **A**.     ***DRUMMOND* AND PLAINTIFF'S RFC**

Plaintiff first asserts that the ALJ erred in relying upon the principle enunciated in *Drummond* when he adopted the prior ALJ's RFC findings because new and material evidence demonstrated that Plaintiff's conditions and RFC had deteriorated such that a new determination was necessary. ECF Dkt. #13 at 11. Plaintiff cites to medical evidence subsequent to ALJ Isbell's July 21, 2001 decision which he posits showed that his neck and back pain had worsened. Tr at 328. He points to a cervical MRI showing disc bulging at C2-3 and C3-4 with a right lateral herniated component impressing slightly on the right anterior aspect of the canal and slightly narrowing the right foramen; broad based disc bulging at C5-6 extending to the left of mid-line and impressing slightly on the left anterior aspect of the canal and somewhat narrowing the left foramen; and another disc bulge at C6-7 extending to the left of mid-line with a left lateral herniated component narrowing the left foramen

and causing bilateral uncovertebral hypertrophy. *Id*. at 12, citing Tr. at 323, 328. Plaintiff also refers to diagnoses assessed on July 25, 2002 for cervical disc displacement with myelopathy and major depression. *Id.*, citing Tr. at 324.

Plaintiff also describes new injuries that he sustained from a motorcycle accident on August 11, 2002, including a high energy distal tibia and fibula fracture, a proximal fibula fracture, and dislocation of the right ankle. ECF Dkt. #12, citing Tr. at 311. Plaintiff underwent an open reduction and internal fixation of the fibular fracture; an open reduction and internal fixation of the distal tibia interarticular fracture; an open reduction and internal fixation of the distal syndesmosis; and a closed reduction of the right ankle dislocation. *Id*, citing Tr. at 302, 306, 311, 313, 424. Plaintiff also points to a spine x-ray during his August 11, 2002 hospital admission which showed degenerative disc disease at C5-6 and C6-7 with cervical spondylosis. *Id.*, citing Tr. at 438. He also references a November 7, 2002 physical examination which revealed obvious atrophy of the right thigh compared to the left and a diagnosis of patella femoral pain syndrome secondary to quadriceps atrophy secondary to immobilization. *Id*., citing Tr. at 271.

Plaintiff also describes left posterior neck pain with radiation to his left upper extremity down to his shoulder for which he received cervical facet joint medial branch nerve blocks on May 5, 2003 and June 11, 2003. ECF Dkt. #13 at 12, citing Tr. at 223, 232, 242. He underwent a facet radiofrequency ablation with cervical medial branch nerve blocks at C4, C5 and C6 on the left. *Id.*, citing Tr. at 207. Plaintiff notes that he was also diagnosed with lumbar disc disease and disc degeneration and cervical spondylosis on October 28, 2003 after complaining of low back pain that occurred with sitting and standing and only allowed him to sit for twenty minutes. *Id*. Epidural steroid injections were scheduled. *Id*. He had a lumbar MRI on November 25, 2003 which showed

-7-

a central extrusion at L5-S1 and hypertrophic changes in the facet joints causing mild narrowing of the central canal and mild bilateral neural foraminal stenosis and a small central protrusion at L2-3 causing mild narrowing of the central canal. *Id*. at 199.  On December 10, 2003, Plaintiff presented to the Cleveland Clinic Pain Management Center and received a steroid injection. *Id*. at 191-192. He eventually underwent a discography on March 2, 2004 and an intradiscal electronthermal annuloplasty at L4-5 on May 21, 2004. *Id.* at 169-170, 186-187.

Ankle pain also plagued Plaintiff after the motorcycle accident.  On October 16, 2003, he was diagnosed with bilateral shin splints status post right ankle open reduction and internal fixation of his dislocated ankle.  ECF Dkt. #13 at 13, citing Tr. at 205.  A physical examination revealed diffuse soft tissue thickening and mild tenderness along the anterior portion of the tibia mid portion bilaterally and at the middle and distal third of the posterior medial tibia. *Id*.

Based upon this evidence, Plaintiff posits that the ALJ was required to perform his own analysis of Plaintiff's RFC and could not simply rely upon *Drummond* in order to deny his claim. *Id.*

The Court finds that the ALJ did not err in relying upon the principle of *Drummond* in this case.  In *Drummond*, the Sixth Circuit Court of Appeals held that a subsequent ALJ is bound by the findings of a prior ALJ when no evidence exists of improvement in a claimant's condition.  126 F.3d at 842.  The Court further held that the Commissioner shoulders the burden of proving changed circumstances in order to escape the application of *res judicata*. *Id.* "In other words, the Commissioner may not make a different finding in adjudicating a subsequent disability claim unless new and additional evidence or changed circumstances provides a basis of a different finding of the individual's residual functional capacity. *See* Social Security Acquiescence Ruling ('SSAR') 98-4(6), 1998 WL 283902 (June 1, 1998)." *Farmer v. Astrue*, No. 3-07-cv-175, 2008 WL 343254 at *6 (S.D.

Ohio Feb. 5, 2008).

In this case, ALJ Carissimi reviewed the prior determination of ALJ Isbell and discussed *Drummond*. Tr. at 19. Based upon his evaluation of the record, he found that no new and material evidence or other circumstances existed which warranted a deviation from the RFC of ALJ Isbell. *Id*. He evaluated the medical evidence presented during the relevant time period of April 24, 2002 through December 31, 2003 and found that it did not represent a significant change in Plaintiff's conditions from the prior determination made by ALJ Isbell. Tr. at 17.

The ALJ reviewed Plaintiff's neck condition, noting that a February 2000 CT scan revealed that Plaintiff had degenerative changes at C4-5, C5-6 and C6-7 with nerve root cutoff at C4-5 on right and bilaterally at C5-6. *Id*. Cleveland Clinic Foundation progress notes dated July 25, 2002 indicate that Plaintiff underwent another cervical MRI in April or May 2002 and the results revealed that Plaintiff had C4-C5 disc bulging with a right lateral herniated component which impressed slightly on the right anterior aspect of the canal and slightly narrowed the right foramen; a broad based disc bulging at C5-6 which extended to the left of mid-line and impressed slightly on the left anterior aspect of the canal and somewhat narrowed on the left with uncovertebral hypertrophy; a disc bulge at C6-7 disc bulge extending to the left of mid-line with a left lateral herniated component and bilateral uncovertebral hypertrophy and a herniated left side component that narrowed the left foramen. *Id*. at 323. He also noted Plaintiff's testimony that he could not perform housework or cook meals due to his neck and back pain. *Id*. at 19.

In finding that Plaintiff's neck impairment had not changed since ALJ Isbell's determination, ALJ Carissimi cited doctor's findings from Plaintiff's report that the Lidoderm he was prescribed was effective for his neck and back pain. Tr. at 19, 327. He also noted Plaintiff's report that conservative

measures such as hot showers and rest partially alleviated the pain.  *Id.*; Tr. at 323.  He also referred to a finding of no joint swelling, deformity or tenderness upon examination of Plaintiff's cervical spine  *Id.* at 324.  Further, the Clinic's progress notes indicate that Dr. Rozen, Plaintiff's neurologist at the Cleveland Clinic, had reviewed these recent MRI results and concluded that "[t]his seems to be pretty consistent with the patient's cervical myelogram in February 2000 in which he had degenerative changes at C4-5, C5-C6 and C6-7."  *Id.* at 323.  Based upon this finding, ALJ Carissimi could conclude that Plaintiff's neck condition had not significantly changed from the previous determination.  Moreover, Plaintiff underwent numerous facet injections to help control his neck pain and he reported on August 27, 2003 that these injections had reduced his pain by fifty percent.  *Id.* at 217.  Plaintiff underwent a facet radiofrequency ablation on August 27, 2003 for neck pain, and he reported on October 28, 2003 that his "symptoms are pretty much resolved in his neck."  *Id.* at 211.  Based upon the recent MRI results that were deemed consistent with the 2000 cervical myelogram, as well as Plaintiff's reports that his neck symptoms were reduced by fifty percent and pretty much resolved shortly thereafter, substantial evidence supports the ALJ's decision to apply *Drummond* and find that Plaintiff's neck condition had not significantly worsened since the prior ALJ decision.

ALJ Carissimi also discussed Plaintiff's back impairment.  A March 2000 MRI revealed degenerative changes in Plaintiff's low back at L4-5 with evidence of disc osteophyte complex and small disc protrusion and degenerative changes of the facet joints resulting in mild spinal stenosis on bilateral foraminal encroachment; and disc degeneration at L4-5.  Tr. at 342.  Plaintiff reported little benefit from physical therapy around this time.  *Id.* at 332.  July 25, 2002 progress notes from the Cleveland Clinic also showed that Plaintiff had mildly to moderately decreased range of motion in his lumbar spine, but no joint swelling, deformity or tenderness.  *Id.* at 324.

-10-

In finding no significant change in his back condition, ALJ Carissimi cited Plaintiff's near normal motor/strength in October 2002 and October 28, 2003 notes showing that Plaintiff had a negative straight leg raising test bilaterally, and a finding that his sensation had no abnormalities.  Tr. at 200.  The ALJ also reviewed Plaintiff's November 25, 2003 MRI showing a L5-S1 central extrusion and hypertrophic changes in the facet joints causing only mild narrowing of the central canal; mild bilateral neural foraminal stenosis; and a small L2-L3 central protrusion causing only mild narrowing of the central canal with neural foramina present.  *Id.* at 199.  Besides the objective medical evidence showing only mild changes and no significant changes in the degenerative disc disease and small protrusions in some of his discs, the ALJ also noted that Plaintiff had reported to his doctor in August 2003 that he had returned to running 1.5 miles three times per week.  Tr. at 20, citing Tr. at 210.  Plaintiff had indicated at the ALJ hearing that he did not recall telling anyone that he had resumed running.  *Id.* at 499. However, additional medical records on October 16, 2003 from the Cleveland Clinic also state that Plaintiff reported that he resumed jogging when he presented complaining of shin splints.  *Id*. at 205.  Orthopaedic doctor Robert Dimeff suggested that Plaintiff stop running for three weeks and then resume at half of his normal distance and work his way back to the mile three times per week that he was previously running.  *Id.*  Based upon the objective medical evidence showing only mild changes and reports that Plaintiff had resumed jogging lengthy distances three times per week, ALJ Carissimi had substantial evidence upon which to find that Plaintiff's back impairment had not significantly changed since the prior ALJ's determination.

ALJ Carissimi also had substantial evidence with which to find that Plaintiff's broken leg and ankle conditions did not present a significant change to warrant a new determination of his RFC.  The ALJ noted that after receiving rehabilitation for his leg, Plaintiff reported to doctors that he had

resumed running 1.5 miles three times per week.  Tr. at 21.  Moreover, x-rays of the right ankle on January 27, 2003 showed interval healing of the fracture.  *Id*. at 253.  Plaintiff indicated that his ankle was improving and Dr. Donley, an orthopedic doctor, indicated upon examination that Plaintiff had good pulses, and his x-rays looked good.  *Id*. at 250.  Plaintiff indicated that at most, his pain level for his ankle was 5 out of 10 but usually no worse than 2 out of 10.  *Id*.  He was told to increase his activity level and return for a check-up in four months.  *Id.*  April 17, 2003 clinic notes indicate that progressive healing of the tibia and fibula fractures was occurring and although some mild swelling and abnormality were noted at the ankle, it was thought that this was consistent with disuse.  *Id.* at 245.  Orthopedic clinic notes from the Cleveland Clinic show that Plaintiff's ankle hardware was intact and his fractures had resolved, with Plaintiff reporting no significant swelling, weakness or paresthesias.  *Id*. at 205.  Plaintiff further indicated that he had received no specific treatment as of late for the ankle.  *Id.*  Plaintiff presented to the clinic on this October 16, 2003 visit complaining of shin pain after exercise.  *Id.*  Dr. Dimeff diagnosed bilateral shin splints and suggested that Plaintiff not run for the next three weeks and then resume his running at half his normal distance of 1.5 miles three times per week.  *Id*.

Based upon the medical evidence showing healing of the fractures, as well as Plaintiff's reports to the doctors that he had resumed running, substantial evidence supports ALJ Carissimi's determination that no significant change in Plaintiff's RFC had occurred since the prior determination, despite Plaintiff's injuries sustained in the motorcycle accident.

### B.    *DRUMMOND*, PLAINTIFF'S MRFC AND TREATING PHYSICIAN RULE

Plaintiff also cites to his worsening mental health conditions after the July 2001 hearing.  ECF Dkt. #13 at 14, citing Tr. at 453.  He notes that he began mental health treatment on December 10,

2001 with Dr. Wolf and after only four sessions, Dr. Wolf indicated on January 30, 2002 that he was unable to work at any occupation.  *Id.*, citing Tr. at 451-454.  She also completed a medical source statement on Plaintiff's mental RFC and concluded that Plaintiff had poor or no abilities to maintain concentration and attention for extended periods of two hour segments; respond appropriately to changes in a routine setting; maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal workday and workweek without an unreasonable number and length of rest periods; understand, remember and carry out simple, detailed, or complex job instructions; socialize; behave in an emotionally stable manner; and relate predictably in social situations.  *Id.* at 451-452.  Dr. Wolf continued to treat Plaintiff through 2002 and 2003, noting his continuing problems with depression, sleep, relationships, concentration and pain.  Tr. at 453-456.  Plaintiff asserts that ALJ Carissimi improperly rejected his treating psychiatrist's assessment and did not even fully adopt the limitations set forth in the assessments of agency psychologists upon which the ALJ stated that he relied and accepted.  ECF Dkt. #13 at 19-20.

ALJ Carissimi reviewed the relevant medical evidence that ALJ Isbell had before him and he reviewed evidence dated both before and after Plaintiff's onset date and date last insured.  Tr. at 19-20.  Upon review of this evidence, ALJ Carissimi found that a change in Plaintiff's MRFC was not warranted.  He noted Dr. Wolf's findings at the end of 2001 that Plaintiff was more depressed and reported difficulty concentrating in April 2002.  However, he found that Dr. Wolf's January 2002 assessment concerned a prior time period than that at issue and found that even if the assessment was relevant to the insured period, it was not supported by Dr. Wolf's clinical notes.  *Id.*  ALJ Carissimi also reviewed psychological assessments by two agency examiners and an agency consultant that were completed well after the relevant time period at issue here and he relied upon their findings to

support his conclusion that Plaintiff had a moderate restriction in his daily living activities due to his mental health conditions, a mild restriction in his ability to socially interact, a moderate difficulty in maintaining concentration, persistence and pace, and he had experienced no episodes of deterioration or decompensation of an extended duration. *Id.* at 20-21.

In rejecting Dr. Wolf's disability opinion and restrictions, ALJ Carissimi first noted that it was outside of the relevant time period. Tr. at 20. However, he then relied upon other medical evidence that was also outside of the relevant time period to support his adoption of ALJ Isbell's MRFC for Plaintiff. The ALJ did not explain why post-date last insured evidence was relevant when pre-date last insured evidence was not. ALJ Carissimi noted that in 2001, Plaintiff saw Dr. David Jones, Ph.D for depression several times, but he did not see a psychiatrist or receive any depression medication. *Id.* This is outside of the insured period. He then reviewed and accepted agency examining psychologist Dr. Felker's July 28, 2004 evaluation and agency consulting psychologist Dr. Umana's August 13, 2004 MRFC form, both of which were also beyond the insured time period. ALJ Carissimi then reviewed and rejected Dr. Luiz Ramirez's August 2006 evaluation notes and letter, finding that it was too far beyond Plaintiff's date last insured. *Id.* at 20-21. ALJ Carissimi cannot pick and choose the medical evidence that favors his position and reject the rest as outside of the relevant time period when the evidence upon which he himself relies is outside of the insured time period. Accordingly, ALJ Carissimi has not provided sufficient justification for rejecting Dr. Wolf's assessment and opinions on this basis.

As to the ALJ's rejection of Dr. Wolf's 2001 assessment as unsupported by her clinical notes, the question is whether ALJ Carissimi properly applied the treating physician rule when he rejected the assessment as unsupported by her clinical notes and instead relied upon the findings and conclusions of state agency psychologists. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally

give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004), quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and

how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007), citing *Wilson,* 378 F.3d at 544.

The Court finds that ALJ Carissimi insufficiently articulated and supported his rejection of Dr. Wolf's assessment and opinion when he found that they were unsupported by her clinical notes because he failed to explain why he made such a finding. It is possible that an ALJ's failure to provide good reasons for rejecting a treating physician's opinion does not require remand if the error is de minimis. *Wilson v. Commissioner of Social Sec.,* 378 F.3d 541, 547 (6th Cir. 2004). "For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal." *Id.,* citing *NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game").

Here, ALJ Carissimi's error is more than de minimis because a reasonable person could find that Dr. Wolf's assessment and opinion were not so patently deficient to lack credit. Dr. Wolf had diagnosed Plaintiff with major depression and chronic pain syndrome on December 10, 2001, a time period before but near Plaintiff's insured period which began on April 24, 2002. Tr. at 453. She indicated in her January 30, 2002 medical source statement, another document that is before the insured period but near it, that Plaintiff had poor or no ability to make occupational adjustments, poor intellectual functioning and poor or no ability to socialize, behavior in an emotionally stable manner or relate predictably in social situations. *Id.* at 451-452. As support for her assessment, she cited her office notes. *Id.* at 452. The accompanying office notes indicated that on the date of Dr. Wolf's medical assessment, January 30, 2002, she found Plaintiff internally preoccupied with depressive feelings. *Id.* at 454. She noted that Plaintiff's preoccupation prevented him from being able to

concentrate for any length of time and he showed marked impairment in his sleep, as well as reduced appetite, loss of interest in activities, dysphoric mood, and psychomotor retardation. *Id*. She stated that Plaintiff would not be able to work at the present time and she increased his medications of Effexor and Trileptal. *Id*. On February 20, 2002, Dr. Wolf noted that Plaintiff had an increase in his pain level, and had difficulty reading and focusing, but reported feeling somewhat better. *Id*. at 455. She increased his medications again. *Id*. On March 19, 2002, Dr. Wolf indicated that Plaintiff reported no significant improvement and difficulty sleeping. *Id*. She stated that he had difficulty maintaining concentration and attention because he was preoccupied with his physical symptoms and ruminating about his inability to function or work. *Id*. She encouraged him to apply for mental health disability. *Id*.

Dr. Wolf's June 18, 2002 notes stated that Plaintiff had stopped taking Effexor after misinterpreting the instructions of his neurologist. *Id*. Dr. Wolf indicated that Plaintiff had poor sleep, diminished appetite, and he showed psychomotor retardation. *Id*. She restarted the Effexor and prescribed Doxepin. *Id*. On July 19, 2002, Dr. Wolf noted that Plaintiff reported feeling even more depressed because he had gastroenteritis so badly that he had to have IVs in the emergency room and had to stop taking the Effexor because he could not keep anything down. *Id*. She indicated that Plaintiff continued to show dysphoric mood, loss of interest in activities, crying spells, sleep disturbances, anorexia, marked anxiety, and difficultly concentrating. *Id*. She started Plaintiff on Nortriptyline. *Id*.

Notes from April 16, 2002 and August 9, 2002 do indicate that Plaintiff felt a slight improvement. Tr. at 456-457. However, December 17, 2002 notes state that Plaintiff was involved in a motorcycle accident in August 2002 and since that time had felt even more depressed. *Id*. at 457. Dr. Wolf restarted Zoloft and refilled the Nortriptyline. *Id*. On January 2, 2003, Plaintiff reported some improvement in his mood and sleep, but he continued to have a reduced appetite. *Id*. February

4, 2003 notes also indicate an improvement in Plaintiff's mood, but he still had little appetite and interrupted sleep.  *Id*.  Plaintiff indicated that he requested that his wife take family leave from her job in order to take care of him when he needed extra help.  *Id*.  Dr. Wolf noted that Plaintiff and his wife were seeing a therapist and she encouraged him to see his own therapist as well.  *Id*.  She continued Plaintiff's Zoloft and increased the dosage of the Nortriptyline.  *Id*.

Clinical notes during the insured period do not show a significant change in Plaintiff's mental conditions that would render Dr. Wolf's initial assessment and opinion patently defective.  However, ALJ Carissimi may have had good reasons to find that Dr. Wolf's notes did not support her assessment and opinion, but he failed to articulate them.  Consequently, the Court finds merit to Plaintiff's claimed error and REMANDS this case for further evaluation by the ALJ of Plaintiff's MRFC with more thorough explanation and analysis of his determination as to the MRFC.

In conjunction with this claimed error, Plaintiff also asserts that the ALJ accepted the opinions of the state agency psychologists, yet failed to accept their degree of limitation as to his concentration and attendance to tasks, toleration of stress and compromised ability to carry out routine tasks.  ECF Dkt. #13 at 20.  The Court makes no ruling on this issue as this issue is dependent upon the reevaluation by the ALJ of Dr. Wolf's assessment and opinion and Plaintiff's MRFC.  However, the Court ORDERS that upon remand, the ALJ explain his reasons for accepting and adopting any part of any doctor's findings, opinions and MRFCs, including Dr. Wolf and the state agency psychologists.

### C.    CREDIBILITY AND ALLEGATIONS OF DISABLING PAIN

Plaintiff also contends that the ALJ used the wrong standard in discounting his credibility because he failed to conduct a symptom analysis as described in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986) and refined in *Felisky v. Bowen*, 35 F.2d 1027 (6th Cir. 1994).  ECF Dkt. #13 at 15-18.  He claims that his testimony relating to his pain and limited activities during the insured period, as well as the medical evidence, established that he had disabling pain from

-18-

his impairments. *Id.* at 17.  Plaintiff asserts that he should not be penalized for possible misstatements concerning his riding of a motorcycle four years earlier and reports that he resumed jogging three times per week. *Id.*

The social security regulations establish a two-step process for evaluating pain.  In order for pain or other subjective complaints to be considered disabling, there must be: (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Duncan,* 801 F.2d at 853.

When a disability determination cannot be made on the basis of the objective medical evidence, an ALJ must analyze the plaintiff's credibility, considering his statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p.  Subjective complaints of pain can support a disability claim if objective medical evidence of an underlying condition exists in the record. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 686 (6th Cir. 1992).  Other relevant factors that the ALJ must consider include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain.  20 C.F.R. 416.929(c)(3)(i)-(vi); SSR 96-7p.  However, an ALJ is not required to accept a plaintiff's own testimony regarding his pain. *Gooch v. Sec'y of Health & Human Servs.,* 833 F.2d 589, 592 (6th Cir. 1987).  Since the ALJ has the opportunity to observe the claimant in person, great deference is given to the ALJ's conclusion about the claimant's credibility. *McCoy o/b/o McCoy v. Comm'r of Soc. Sec.,* 81 F.3d 44, 47 (6th Cir. 1995).  Nevertheless, substantial evidence must support an ALJ's assessment of a claimant's credibility. *Id.*  If the ALJ rejects or discounts the claimant's complaints as not credible, he must clearly state his reasons for doing so. *Felisky,* 35 F.3d at 1036.

Although he did not label his review and analysis, the ALJ did provide an analysis pursuant to SSR 96-7p in his decision and did not solely rely upon the facts that Plaintiff rode a motorcycle and reported to doctors that he was running three times per week.  He cited SSR 96-7p and 20 C.F.R. § 404.1529 in his decision and stated that he had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  Tr. at 18.  He then cited Plaintiff's testimony relating to his back pain, neck pain, fingertip numbness, and leg weakness, as well as his report that he was unable to sit, stand, or walk for more than one hour at a time.  *Id*. at 19.  ALJ Carissimi also cited Plaintiff's reports to doctors that he had worsened pain upon bending, excessive walking or standing for long periods of time, as well as his report that he used a TENS unit and tried physical therapy.  *Id.*  Further, he noted Plaintiff's report that the Lidoderm prescribed for his back and neck pain was effective and rest and hot showers also helped to alleviate the pain.  *Id*.  Review of this evidence constitutes consideration of the factors relating to the location, duration, frequency and intensity of pain, and the treatment, besides medication, that Plaintiff used to relieve his pain.  *See* SSR 96-7p.

After referring to Plaintiff's reports of pain and limitations resulting therefrom, ALJ Carissimi discussed the medical evidence that supported his decision to discount Plaintiff's complaints of disabling pain and limitations.  He cited Plaintiff's normal gait and lack of swelling, deformity or tenderness in his neck.  Tr. at 20.  He noted that in October 2002, Plaintiff's motor/strength was normal and Plaintiff reported that his pain intensity was a 3 on a scale of 1-10.  *Id.*  He indicated that Plaintiff had a negative straight leg-raising test on October 28, 2003 and he had no pain with extension or lateral bending, although he did have pain with flexion.  *Id.*  The ALJ also cited some of Plaintiff's activities, including Plaintiff's testimony that he rode a motorcycle on the weekends until August of 2002 when he was involved in the accident and his report to a doctor in 2003 that he was running 1.5 miles three times per week.  *Id.* at 21.

-20-

Based upon the medical evidence and Plaintiff's report of his activities, ALJ Carissimi had substantial evidence to support his discounting of Plaintiff's complaints of disabling pain. Plaintiff cites to his own testimony as support for the severity and limiting effects of his pain. ECF Dkt. #13 at 17. The ALJ reviewed this testimony and found that it conflicted with some of the activities that Plaintiff reported that he performed during the insured period.   While Plaintiff contends that he should not be penalized for misstatements that were made four years after "the event", the Court finds no such misstatements in the record. At the ALJ hearing, Plaintiff stated that he rode his motorcycle on the weekends prior to his accident in August 2002. *Id*. at 492-493. The ALJ found that Plaintiff's riding of his motorcycle prior to his accident in August 2002 negated his complaints of disabling pain and the ALJ could reasonably find that riding a motorcycle from April 2002 through August 2002, part of Plaintiff's insured period, could negate Plaintiff's complaints of disabling neck and back pain during that time period.

Further, the ALJ did not misstate the doctor's note in the record that indicated that Plaintiff told his doctor after rehabilitation for the injuries that he suffered in the motorcycle accident that he was running three times per week.  In his decision, ALJ Carissimi noted that Plaintiff denied this at the hearing and he cited the note in the record that confirmed the report. Tr. at 21.  In fact, two reports in the record indicate that Plaintiff told doctors that he was running three times per week in 2003.  The first is the note cited by the ALJ which is a report by Plaintiff to Dr. Donley of the Cleveland Clinic in August 2003 that he had returned to running 1.5 miles three times per week.  Tr. at 20, citing Tr. at 210. The second is an October 16, 2003 note from orthopaedic doctor, Dr. Dimeff of the Cleveland Clinic, which states that Plaintiff reported that he resumed jogging when he presented complaining of shin splints. *Id*. at 205.  Orthopaedic doctor Robert Dimeff suggested that Plaintiff stop running for three weeks and then resume at half of his normal distance and work his way back to the mile three times per week that he was previously running. *Id.*  The ALJ questioned Plaintiff's truthfulness on

this matter since a report in his file confirmed a report that Plaintiff was running three times per week. This credibility determination was left to the ALJ and he provided adequate support for his findings on this issue.  Based upon the medical evidence and Plaintiff's activities, substantial evidence supports the ALJ's decision to discount Plaintiff's complaints of disabling pain.

However, since the Court has remanded the MRFC portion of this case for further evaluation and analysis by the ALJ, the Court cannot rule on whether substantial evidence supports the ALJ's decision to discount Plaintiff's complaints of disabling symptoms resulting from his mental health conditions.  As above, the ALJ relied upon his rejection of Dr. Wolf's disability assessment and opinion because they preceded the insured time period and were unsupported by her clinical notes. However, he adopted some of the opinions, limitations and assessments of agency psychologists who rendered their opinions subsequent to the insured time period and failed to explain why the post-insured medical evidence was reliable and the pre-insured medical evidence was not.  He also failed to explain why Dr. Wolf's clinical notes did not support her opinion and assessment and he failed to explain why he only adopted certain portions of the opinions, limitations and assessments of the agency psychologists whose opinions he accepted in his decision.

Accordingly, the Court finds no merit to Plaintiff's assertion that the ALJ erred in discounting his complaints of disabling pain.  However, the Court REMANDS this case for further explanation and analysis of Plaintiff's complaints of disabling symptoms from his mental health conditions once the treating physician rule and Plaintiff's MRFC issues are reevaluated and analyzed.

## VI.   CONCLUSION

For the foregoing reasons, the Court REVERSES the ALJ's decision denying Plaintiff DIB and REMANDS this case for further evaluation and analysis of the opinions and assessments of Plaintiff's  treating psychiatrist, Plaintiff's MRFC, and Plaintiff's complaints of disabling symptoms

from his mental health conditions.

Dated: September 26, 2008                                    /s/George J. Limbert
                                                          GEORGE J. LIMBERT
                                                          U.S. MAGISTRATE JUDGE